Filed 9/8/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ELIJAH DOVELL ROBERTS,<br><br>    Defendant and Appellant. | A170546<br><br>(Contra Costa County<br>Super. Ct. No. 012202322) |

Elijah Dovell Roberts was convicted by plea of carrying a concealed, loaded firearm in a vehicle in violation of Penal Code section 25400, subdivision (a)(1)[1] and carrying a loaded firearm in a vehicle when the firearm was not registered to him (§ 25850, subds. (a) & (c)(6)).  Roberts contends his conviction must be reversed on the ground that sections 25400 and 25850 are unconstitutional under *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 [142 S.Ct. 2111] (*Bruen*) and *United States v. Rahimi* (2024) 602 U.S. 680 [144 S.Ct. 1889] (*Rahimi*).  We disagree and affirm.

## I. BACKGROUND

On April 13, 2021, California Highway Patrol Officer Thadeus Johnson was driving on Interstate 680 in Concord, California.  At approximately 10:30

---

[1] All further undesignated statutory references are to the Penal Code.

a.m., Johnson saw a Nissan Altima travelling on the interstate at a high rate of speed. Johnson followed the Altima and eventually the Altima stopped.

Roberts, the driver of the Altima, was the only person in the car. When pulled over, he told Johnson he did not have a driver's license. Johnson saw a driver's license in the center console and asked Roberts to give him the license. Roberts complied. Johnson examined the driver's license and determined it was fake. Roberts said he used the license to get into clubs.

Johnson ran the number on the driver's license through a law enforcement database, which yielded the name of a different man. Johnson impounded the Altima because Roberts did not have a driver's license, and conducted an inventory search. As part of that search, Johnson looked inside a black bag and found a loaded handgun and $14,000 in cash, at which point Roberts was arrested. Johnson saw the serial number on the gun and attempted to find the registered owner. Using the eTrace system, Johnson determined the gun had several previous registered owners, none of whom was Roberts.

Prior to his preliminary hearing, Roberts filed a demurrer seeking to dismiss counts 1 and 2 on Second Amendment grounds. After the trial court denied that motion, the district attorney filed an information with the same two felony firearms charges and a misdemeanor charge relating to the driver's license (Veh. Code, § 14610, subd. (a)(1)), and Roberts pled no contest to all the charges in the information.

Roberts filed a timely notice of appeal, and the trial court granted his request for a certificate of probable cause to pursue the appeal.

## II. DISCUSSION

Roberts argues that, under *Bruen*, California's concealed carry firearm licensing scheme at the time of his offense, codified at section 26150 (former

2

§ 26150, added by Stats. 2010, ch. 711, § 6, and amended by Stats. 2023, ch. 249, § 10, eff. Jan. 1, 2024), is facially unconstitutional, perforce rendering unconstitutional as well section 25400, subdivision (a)(1)'s prohibition against an unlicensed person carrying a concealed firearm in a vehicle. He further contends that section 25850 does not satisfy the " 'history and tradition' " prong of the constitutional test articulated in *Bruen*. For the reasons explained below, we reject both arguments.

### A. *Standard of Review*

" 'The interpretation of a statute and the determination of its constitutionality are questions of law. In such cases, appellate courts apply a de novo standard of review.' " (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474.)

" ' "A defendant challenging the constitutionality of a statute carries a heavy burden: 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " ' [Citations.] Typically, a litigant may challenge the constitutionality of a statute in two ways: on its face or as applied." (*In re D.L.* (2023) 93 Cal.App.5th 144, 156–157 (*D.L.*).)

"A facial challenge seeks to void the statute as a whole by showing that ' "no set of circumstances exists under which the [statute] would be valid," *i.e.*, that the law is unconstitutional in all' " (*D.L., supra*, 93 Cal.App.5th at p. 157; see also *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [" ' "[P]etitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions" ' "]) or at least the " " 'great majority of cases' ' " (*In re T.F.-G.* (2023) 94 Cal.App.5th 893, 909, italics omitted). When reviewing a facial challenge to a statute, we "consider[] only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe*, at

3

p. 1084.) In contrast, a defendant making an "as applied" challenge to a statute "seek[s] 'relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied.' " (*D.L.*, at pp. 157–158.)

" 'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact' " because an unconstitutional provision in a statute " 'does not necessarily defeat or affect the validity of its remaining provisions.' " (*Free Enterprise Fund v. Public Company Accounting Oversight Bd.* (2010) 561 U.S. 477, 508 [130 S.Ct. 3138, 3161].) If only a portion of the statute is unconstitutional, and that portion is severable, courts will uphold the statute as constitutional. (*People v. Mosqueda* (2023) 97 Cal.App.5th 399, 414.)

### B. *Legal Landscape Under the Second Amendment as Construed by the United States Supreme Court*

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.)

In *District of Columbia v. Heller* (2008) 554 U.S. 570, 595 [128 S.Ct. 2783, 2799], the United States Supreme Court recognized, based on "both text and history, that the Second Amendment confer[s] an individual right to keep and bear arms." The Court went on to explain the right is not "unlimited" and has never been understood to be "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id.* at p. 626 [128 S.Ct. at p. 2816].) The Court specifically identified as "presumptively lawful regulatory measures" "longstanding

4

prohibitions on the possession of firearms by felons." (*Id*. at pp. 626–627 & fn. 26 [128 S.Ct. at pp. 2816–2817 & fn. 26].)

Then, in *Bruen*, the Supreme Court set forth the following framework for deciding Second Amendment claims: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen, supra*, 597 U.S. at p. 17 [142 S.Ct. at p. 2126].)

The Court explained that "history guide[s] our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' " (*Bruen*, *supra*, 597 U.S. at pp. 28–29 [142 S.Ct. at p. 2132].) "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. . . . [It] requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." (*Id*. at p. 30 [142 S.Ct. at p. 2133], original italics.)

More recently, in *Rahimi*, the Court cautioned that its Second Amendment "precedents were not meant to suggest a law trapped in amber." (*Rahimi*, *supra,* 602 U.S. 680 at pp. 691, 700 [144 S.Ct. at pp. 1897, 1902–1903] [holding a federal statute prohibiting a person subject to a domestic violence restraining order from possessing a firearm withstands a Second Amendment challenge and rejecting argument that the historical analogues were insufficiently similar "to place the [federal law] in our historical tradition"].) The Court explained, "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. [Citation.] A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" (*Rahimi,* at p. 692 [144 S.Ct. at p. 1898].)

C. *Challenged California Licensing Scheme*

California law prohibits carrying a firearm in public, whether the weapon is concealed or carried openly, and whether it is loaded or unloaded. (§§ 25400, subd. (a) [concealed firearm in vehicle or on person][2], 25850,

---

[2] Until 2024, section 25610 stated, "(a) Section 25400 shall not be construed to prohibit any citizen of the United States over the age of 18 years who resides or is temporarily within this state, and who is not prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, from transporting or carrying any pistol, revolver, or other firearm capable of being concealed upon the person, provided that the following applies to the firearm:  [¶] (1) The firearm is within a motor vehicle and it is locked in the vehicle's trunk or in a locked container in the vehicle. [¶] (2) The firearm is carried by the person directly to or from any motor vehicle for any lawful purpose and, while carrying the firearm, the firearm is contained within a locked container. [¶] (b) The provisions of this section do not prohibit or limit the otherwise lawful carrying or transportation of any pistol,

subd. (a) [loaded firearm in public], 26350, subd. (a) [unloaded and exposed handgun in public].) There are numerous statutory exceptions to these prohibitions, but if a law-abiding California citizen does not qualify for one of the exceptions, generally the citizen's only means for lawfully carrying a handgun in public for self-defense is to obtain a license to carry a concealed handgun under section 26150.

That brings us to the specific statutes under which Roberts was convicted. The prohibitions against carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(1)) and public carrying of a loaded firearm registered to another person (§ 25850, subds. (a) & (c)(6)) do not apply to a person licensed to carry a concealed handgun (§§ 25655, 26010[3]). Sections 26150 and 26155 are among the exceptions to the criminal prohibitions on the public carrying of firearms in California. These statutes effectively conditioned Roberts's

revolver, or other firearm capable of being concealed upon the person in accordance with the provisions listed in [s]ection 16580." (Former § 25610, added by Stats. 2010, ch. 711, § 6, later amended by Stats. 2023, ch. 249, § 8, eff. Jan. 1, 2024.)

Effective January 1, 2024, pursuant to Senate Bill No. 2 (2023–2024 Reg. Sess.), the Legislature amended section 25610 by making the following substantive changes: Limiting the transportation of the concealed weapon to the purposes set forth in sections 25510 to 25595; clarifying that either former subdivision (a)(1) or former subdivision (a)(2) would trigger the exemption, and both conditions need not be present; adding a requirement that the firearm be unloaded; removing the "for any lawful purpose" requirement in former subdivision (a)(2); and removing former subdivision (b). The revisions to section 25610 do not affect the issues on appeal here.

[3] Section 26150 covers the issuance of concealed carry licenses by a county sheriff. (§ 26150, subd. (a).) Section 26155 covers the issuance of concealed carry licenses by the chief of police. (§ 26155, subd. (a).) Roberts focuses his claim of facial invalidity on former section 26150, and we limit our discussion to that provision.

right to carry firearms in the concealed manner that he admittedly did on obtaining a license exempting him from criminal sanctions for that conduct.

Sections 26150 and 26155 set forth California's requirements for obtaining a license to carry a concealed firearm. At the time of Roberts's offense, former section 26150 required an applicant for a concealed carry license to meet four requirements: They must (1) be "of good moral character"; (2) provide "[g]ood cause . . . for issuance of the license"; (3) be a resident of the county in which they are seeking the license; and (4) complete a firearms training course. (Former § 26150, subd. (a), added by Stats. 2010, ch. 711, § 6, later amended by Stats. 2023, ch. 249, § 10, eff. Jan. 1, 2024 (former section 26150(a)).) In 2023, after the Supreme Court issued its decision in *Bruen*, the Legislature amended former section 26150, subdivision (a) and, among other changes, removed the "[g]ood cause" requirement. (Stats. 2023, ch. 249, § 10.)[4]

Roberts contends that the prohibitions against carrying a concealed weapon in a vehicle (§ 25400, subd. (a)(1)) and against public carrying of a firearm registered to a third party (§ 25850, subds. (a) & (c)(6)) are necessarily invalid because the licensing regime on which they rest (§§ 26150, 26155) is facially unconstitutional under the Second Amendment. The heart

---

[4] Effective January 1, 2024, pursuant to Senate Bill No. 2 (2023–2024 Reg. Sess.), the Legislature replaced the "good cause" requirement with a requirement that the applicant be and prove that they are at least 21 years of age; replaced the "good moral character" requirement with a requirement that the applicant meet the standards set forth in section 26202, which governs the designation of persons disqualified from obtaining a concealed-carry license; replaced the "may issue" language with "shall issue"; added guidance on the evidence needed to establish residency in the county; and added the requirement that the applicant be the registered owner of the firearm for which they are seeking the concealed-carry license. (Stats. 2023, ch. 249, § 10.)

of his argument is that this licensing scheme cannot pass muster under the Second Amendment because it allowed discretionary license denial without a finding that the license applicant is dangerous.

**D. *Analysis***

Two published California cases reject Second Amendment challenges to statutes that limit firearm possession without a prerequisite finding of a defendant's criminality or dangerousness. (See, e.g., *D.L., supra,* 93 Cal.App.5th at pp. 162–167 [rejecting facial challenge to § 25850 in light of *Bruen*]; *People v. Bey* (2025) 108 Cal.App.5th 144, 165–167 [same; post-*Rahimi*].) Neither of these cases squarely addresses the Second Amendment issue Roberts presents. Because, immediately after *Bruen* was decided,[5] the Attorney General conceded that the "good cause" component of the licensing scheme that exempts carrying concealed weapons in violation of section 25850, subdivision (a) is unconstitutional under *Bruen*, these courts held the good cause requirement to be severable from the remainder of the licensing scheme,[6] and then, evaluating what was left, held that section

---

[5] "Within a day of the *Bruen* decision, the Attorney General instructed firearm-permitting agencies that proof of 'good cause' is no longer required in order for an applicant to receive a concealed carry license." (See *D.L., supra,* 93 Cal.App.5th at p. 148.)

[6] This case presents no severability issue. Without any attack on the pre-2023 licensing regime as it stood prior to the deletion of the "good cause" requirement by legislative amendment and without attacking any other aspect of the licensing regime under sections 26150 and 26155, Roberts dives straight into the merits of his Second Amendment attack on California's licensing scheme. The Attorney General argues severability at length in his respondent's brief, drawing no reply from Roberts on this issue. Roberts does not make any attack on the licensing scheme based on the "good cause" requirement or any ground other than that the governing scheme does not require a finding of dangerousness.

25850, subdivision (a) passes muster under the Second Amendment. We arrive at the same conclusion in this case.

Roberts claims *D.L* and *Bey* were wrongly decided because they "fail to properly evaluate whether a restriction on the fundamental right of Americans to possess firearms comports with the history and tradition of the United States." We disagree and embrace the Second Amendment holdings in those cases, but here we go a step further. We hold that, since licensure is a reasonable mode of screening that aids the state in determining who is a felon, and thus automatically ineligible for a license, it does not violate the Second Amendment to require licensure as a prerequisite to possessing a firearm.

To understand why, and specifically why this conclusion is consistent with history and tradition at the time the Second Amendment was adopted, we begin with *People v. Anderson* (2024) 104 Cal.App.5th 577. After thoroughly canvassing the pertinent historical record, the *Anderson* panel explained that accepted practices at the time of the founding "show the generation that adopted the Second Amendment understood the right it was enshrining in the Constitution to be limited. The right to arms familiar to [the founders] allowed for both categorical disarmament of groups that the legislature assessed as threatening to the community, and individual disarmament as a consequence for criminal conduct." (*Id.* at p. 598.) Beyond that, we need not reiterate or restate the historical analysis in *Anderson*. (See *Anderson*, at pp. 589–595.) We agree with it, as did the *Bey* court. (See *Bey*, *supra,* 108 Cal.App.5th at pp. 161–162.)[7]

---

[7] Although we reject Roberts's suggestion that *D.L.* and *Bey* were wrongly decided, we view *Bey*, as a post-*Rahimi* decision, as the more pertinent of these two cases.

But the precise facial invalidity argument Roberts makes here was not made in *Bey* or *Anderson*, presumably because the defendants in those cases had been convicted of various felonies. The main issue those courts addressed (having found the "good cause" requirement in former section 26150, subdivision (a), to be severable from the rest of the California licensing scheme), was whether, consistent with the Second Amendment, those defendants—having been convicted of multiple felonies—"could have been disarmed as punishment for at least one of these crimes" at the time of the founding. Upholding the statutes of conviction in those cases, the *Bey* and *Anderson* courts answered that question yes.

In this case, the record is silent whether, at the time of the offenses at issue here, Roberts had been convicted of a felony. For all we know, he was a law-abiding citizen up to that point. But since this is a facial constitutional challenge, and taking as our premise that California can criminally proscribe convicted felons from carrying concealed firearms—as *Bey* and *Anderson* correctly held—we build on that premise and hold that it can also require those who wish to carry concealed weapons publicly to obtain a license as a prerequisite, without a finding of dangerousness.

*Bruen* acknowledged that background checks and firearms safety courses will pass muster as prophylactic measures in the face of Second Amendment challenge, provided they are based on " 'narrow, objective, and definite standards' ". . . . (*Bruen, supra*, 597 U.S. at p. 38, fn. 9 [142 S.Ct. at p. 2138].) Roberts makes no argument that the type of narrow, objective and definite licensing standards envisioned in *Bruen* are lacking here. Instead, he advances the broad claim that no licensing requirement can be valid under the Second Amendment unless license denials are limited to persons found to

11

be dangerous. We cannot agree. Roberts's dangerousness argument overreads *Bruen*, and nothing in *Rahimi* goes that far.

"Unlike the regulation struck down in *Bruen*," the licensing regulations in this case do "not broadly restrict arms use by the public generally." (*Rahimi, supra*, 602 U.S. at p. 698 [144 S.Ct. at p. 1901].) Because firearms licensure guided by appropriate standards is a reasonable means of screening to see whether anyone applying for a concealed carry permit is a felon—and thus is not a " 'law-abiding, responsible citizen[]' " (*Bruen, supra*, 597 U.S. at p. 38, fn. 9 [142 S.Ct. at p. 2138])—we reject Roberts's contention that the licensing scheme at issue here is facially invalid.

### III. DISPOSITION

Affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
CLAY, J.*

---

* Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:       Superior Court of California, County of Contra Costa

Trial Judge:      Hon. Charles B. Burch

Counsel:         Micah Reyner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Katie L. Stowe, Deputy Attorneys General for Plaintiff and Respondent.